IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| GREGORY LEE BOETTICHER, | ) | CASE NO. 3:25-cv-01220-JRK |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES R. KNEPP II |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| FRANK BISIGNANO, | ) | |
| Commissioner of Social Security, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

**I.     Introduction**

Plaintiff, Gregory Lee Boetticher ("Boetticher"), seeks judicial review of the final decision of the Commissioner of Social Security, denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Boetticher raises one issue on review of the Administrative Law Judge's ("ALJ") decision, arguing that the ALJ improperly relied on her own lay opinion in assessing his residual functional capacity ("RFC"). (ECF Doc. 7, p. 1). Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Boetticher's application for SSI be affirmed.

**II.     Procedural History**

Boetticher protectively filed for SSI on December 19, 2022, alleging a disability onset date of December 3, 2022. (Tr. 191-94). The claims were denied initially and on reconsideration. (Tr. 78, 97). Boetticher then requested a hearing before an ALJ. (Tr. 118). Boetticher, represented by counsel, and a Vocational Expert ("VE") testified before an ALJ on January 19,

1

2024. (Tr. 35-77). On May 24, 2024, the ALJ issued a written decision finding Boetticher not disabled. (Tr. 14-34). The Appeals Council denied his request for review on April 11, 2025, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; see 20 C.F.R. §§ 404.955, 404.981). Boetticher timely filed this action on June 10, 2025. (ECF Doc. 1).

### III. Evidence

#### A. Personal, Educational, and Vocational Evidence

Boetticher was born September 11, 1976. (Tr. 191). He was 46 years old on the protected filing date making him a younger individual according to agency regulations. (Tr. 79). He completed the 10th grade. (Tr. 219). He has past relevant work as a machine operator, DOT 754.685-014, SVP 2, light exertional level; construction worker, DOT 869.664-014, SVP 4, heavy exertional level; and tow motor operator, DOT 921.683-050, SVP 3, medium exertional level as generally performed, and light exertional level as he performed it. (Tr. 27).

#### B. Relevant Medical Evidence

On April 12, 2022, Boetticher established as a patient with Dr. Kaitlin Schwerer, D.O. (Tr. 290). He reported to her that he had prior assessments of arthritis in his lumbar spine and carpal tunnel syndrome in his bilateral wrists. (*Id.*). He also complained of pain in his hands, his right knee, and sometimes in his left pelvis. (*Id.*). Boetticher suggested that his pain is related to the work he does as a roofer. (*Id.*).

The following day Boetticher presented to the emergency department complaining of lower back pain. (Tr. 322). Examination notes indicate mild lumbar paraspinal tenderness to palpation bilaterally, with normal gait,strength intact, and that Boetticher received a Toradol injection for the pain. (*Id.*). X-rays showed lower lumbar degeneration with no acute findings (Tr. 325), minimal mid-cervical listhesis with cervical spondylosis most prominent at C5-6 (Tr.

2

332), and moderate thoracic spondylosis (Tr. 334). Boetticher returned to see Dr. Schwerer on April 15, 2022, claiming extreme pain in his mid- and low-back. (Tr. 294). His strength was measurend as 5/5 in his bilateral lower extremities, and he had tenderness to light palpation over the paraspinal muscles in his bilateral thoracic and lumbar spine. (*Id.*). He returned to the emergency department on May 12, 2022, again complaining of lower back pain, but refused an x-ray or a Toradol injection. (Tr. 320). He was given a medrol dosepak and diclofenac gel. (*Id.*).

Boetticher attended an appointment with a rheumatologist, Margaret Tsai, M.D., on May 24, 2022, for an evaluation of his positive ANA. (Tr. 368). He indicated ongoing back and knee pain, worsening over the previous 6 to12 months, with numbness and tingling in his bilateral lower extremities, and cramping in his hands. (*Id.*). Dr. Tsai diagnosed him with positive ANA; chronic pain of the bilateral feet, ankles, knees, and hips; fibromyalgia; chronic lower back pain with bilateral sciatica; secondary osteoarthritis, bilateral carpal tunnel syndrome; and hand cramping. (*Id.*).

On June 1, 2022, Boetticher attended an appointment with Thomas Felter, M.D., for pain management. (Tr. 344-46). He rated his lower back pain as eight out of ten, and indicated he was struggling to perform his activities of daily living. (*Id.*). He further indicated he had historically found no relief from medical marijuana, percocets, Mobic, neurontin, or epidurals. (*Id.*). Boetticher had an evaluation of his hands on June 8, 2022, which showed a flattening of the thenar eminence due to atrophy, right worse than left. (Tr. 348). An EMG was positive for right carpal tunnel syndrome from demyelinating syndrome. (*Id.*). A carpal compression test was positive on the right, and he was assessed with bilateral carpal tunnel syndrome and advised to wear a brace and begin occupational therapy. (*Id.*).

Boetticher began physical therapy to treat his lower back pain on July 1, 2022, but was discharged on July 21, 2022. (Tr. 299-313). He had a lumbar MRI performed on August 31, 2022, which revealed broad based disc bulge with facet hypertrophy at L3-4 and L4-5, with mild spinal canal narrowing, and mild bilateral neural foraminal narrowing at L3-4 and mild to moderate bilateral neural foraminal narrowing at L4-5. (Tr. 297). At an appointment with Dr. Felter on September 27, 2022 it was determined that Boetticher had failed previous conservative treatment, including physical therapy, and that Boetticher felt his symptoms were progressing. (Tr. 339). He declined interest in any other conservative treatment options, and Dr. Felter prescribed a muscle relaxer but refused to prescribe opiates. (*Id.*).

Boetticher attended a pain management appointment on November 23, 2022, where he described diffuse body pain, worst in his lower back, at a level of eight out of ten. (Tr. 554). He had an appointment with Dr. Tsai where he indicated he had no interest in pain medications and was unable to afford medical marijuana. (Tr. 523). He complained of sharp pain in his bilateral hands and wrists, knees, hips, and feet, with some cramping and experience of dropping objects he was holding. (*Id.*). He ambulated slowly with some tenderness in his lumbar, hips and knees (right worse than left), knees, ankles, hands, wrists, and neck, with decreased range of motion. (*Id.*).

On February 22, 2023, Boetticher presented again with back pain he described as sharp, dull, and stabbing, at a level of ten out of ten. (Tr. 402). Examination notes showed, "Good Gait able to walk on Toes and Heels pain on Lumbar flexion and Extension, No tenderness Pain on SLRs both sides more Rt. Side [*sic*]." (Tr. 403). Boetticher received a trans foraminal epidural steroid injection ("TFESI") at right L4-5 and left L5-S1. (Tr. 428).

On April 4, 2023, Boetticher underwent a right knee MRI that showed an oblique tear at the posterior horn of the medial meniscus extending to the tibial articular surface with a 7 mm osteochondral stable fragment in the posterior portion of the medial femoral condyle. (Tr. 703). Surgery was recommended due to the results of the MRI, as well as a previous x-ray that showed medial compartment degenerative joint disease with a loss of space, osteophytes and a small cyst, and assessed a tear of the medial meniscus of the right knee with osteochondral defect of the femoral condyle; internal derangement of the right knee; right knee primary osteoarthritis; and bilateral capral tunnel syndrome. (Tr. 410). Boetticher underwent an arthroscopic right knee medial menscectomy on May 23, 2023. (Tr. 434). At his first post-operative follow up on May 31, 2023, Boetticher's right knee was swollen with moderate effusion, so an aspiration was performed. (Tr. 441).

On April 27, 2023, Boetticher reported he had received little benefit from the TFESI, and received right L4-5 and L5-S1 facet blocks. (Tr. 785). He received facet blocks again on May 5, 2023 (Tr. 780), June 22, 2023 (Tr. 776), and July 5, 2023 (Tr. 773). He also underwent radiofrequency ablations on June 27, 2023 (Tr. 769) and August 14, 2023. (Tr. 766).

On August 7, 2023, 11 weeks after his partial medial meniscectomy, Boetticher reported he was mostly returning to normal, but had experienced pain for the past three days, particularly with activity. (Tr. 472). He again reported right knee pain on October 25, 2023, but refused cortisone shots and pain medications as he found those ineffective in the past. (Tr. 470). Examination notes document some pain at the medial retinaculum with a mild click with knee extension, but 5/5 strength. (*Id.*). Boetticher was prescribed nabumetone, Tylenol, and Toradol for breakthrough pain, and referred for physical therapy. (*Id.*). He started physical therapy on November 17, 2023. (Tr. 665).

5

On November 14, 2023, Boetticher presented to the emergency department with lower back pain without paresthesias or radiating pain down his lower extremities. (T. 676). There was bilateral lumbar tenderness with palpation, but x-rays revealed no acute bony deformity. (*Id.*). Another x-ray on November 27, 2023 showed degenerative changes of the lumbar spine with moderate disc space narrowing at L1-2, similar to prior studies. (Tr. 675). He was assessed with lumbar radiculopathy, lumbar disc herniation and sacroiliac inflammation. (Tr. 805). On January 15, 2024, Boetticher appeared at pain management with complaints of axial neck and back pain that had grown increasingly worse over the past two years, and was affecting his sleep and his ability to perform activities of daily living. (Tr. 807). He was assessed with sacroiliitis, spondylosis without myelopathy or radiculopathy in the lumbosacral region, and other chronic pain. (*Id.*).

    **C.**    **Medical Opinion Evidence**

        **1.**    **State Agency Reviewing Opinion Evidence**

On March 3, 2023, state agency reviewing physician Douglas Chang, M.D., opined that Boetticher was capable of performing work at the light exertional level except that he could only occasionally climb ramps or stairs, but could never climb ladders, ropes or scaffolds; could occasionally stoop, kneel, crouch or crawl; he was limited in his ability to reach overhead bilaterally; and he needed to avoid allexposure to hazards. (Tr. 83-85). Dr. Chang's opinion was affirmed by state agency reviewing physician Gerald Klyop, M.D., on July 27, 2023. (Tr. 92-95).

        **2.**    **Treating Source Opinion Evidence**

Dr. Schwerer submitted a primary source statement on December 5, 2023, in which she noted diagnoses of joint pain, back pain, paresthesias, positive ANA, hypertension, and impaired fasting glucose. (Tr. 499). She did not opine further, however, noting that she had not tested his

6

functional capacity, was treating him only for his high blood pressure and not chronic pain, and she had not seen him in seven months as he had failed to appear for his last scheduled appointment. (Tr. 499-505).

      D.      **Administrative Hearing Evidence**

Boetticher testified before an ALJ on January 19, 2024. (Tr. 35-77). He testified that he was 47 years old and that he had a 10th grade education. (Tr. 43). He had last worked driving a dump truck for a concrete company for a couple of months prior to Thanksgiving 2023. (Tr. 43-44). He resides by himself, and is capable of driving. (Tr. 55). He lives in a first floor apartment, but there is a basement and it hurts his knees and back to go up and down the stairs. (*Id.*). He does household chores such as sweeping, mopping, and wiping countertops, but his girlfriend does his laundry and he is limited to preparing simple foods. (Tr. 56). He spends most of his time watching television. (*Id.*). He will also cut the grass, water flowers, or clear some snow. (Tr. 56-57). He occasionally goes on Facebook, but does not consider himself very social. (Tr. 58). He spends most weekends with his girlfriend and her autistc son. (Tr. 59).

He reports problems with his lumbar, neck, knees, and hands. (*Id.*). He has tried physical therapy for his back and knees but found "it was just too much." (Tr. 60). He has found no relief from injections in his SI joints or radiofrequency ablation. (*Id.*). The only medication he is currently taking is for his blood pressure. (Tr. 61). When he tries to hold onto anything for a long period of time, such as a hammer, after a few minutes his hands will start to cramp. (Tr. 62). He wears braces on his hands at night. (*Id.*).

Under questioning by his attorney Boetticher noted his right hand was a bigger problem than his left, but that both are bad, and he drops things at least a few times every day. (Tr. 63). His hands also cramp and cause him pain sometimes when he drives. (Tr. 64). He testified that if

his most recent employer offered to have him return he would try to do it, at least on a part-time basis. (Tr. 65). He thinks he could work three to five hours per day. (*Id.*). He becomes uncomfortable if he sits more than a few minutes, regardless of the type of chair,and he has to then get up and stretch for a couple of minutes. (Tr. 65-66). His back starts hurting after he walks five to ten minutes. (Tr. 66). He is unable to stand in one place, he has to move around. (*Id.*). He has to take breaks when doing chores such as washing the dishes because of his inability to stand in one place. (*Id.*). He cannot do a full trip to the grocery store, rather, he will just pick up a few items at a time. (Tr. 67). He also testified to headaches he attributes to his high blood pressure. (Tr. 68).

Once Boetticher's testimony was complete, VE Mary Everts testified. (Tr. 70-76). VE Everts classified Boetticher's past work as a dump truck driver, DOT 902.663-010, SVP 2, described in the DOT at the medium exertional level but performed at light; as a construction laborer, DOT 869.687-026, SVP 2, described in the DOT as very heavy, performed at light; as a construction worker, DOT 869.664-014, SVP 4, described in the DOT and performed at the heavy exertional level; as a tow motor operator, DOT 921.683-050, SVP 3, described in the DOT at the medium exertional level, but performed at light; and as a machine operator, DOT 754.685-014, SVP 2, described in the DOT and performed at light. (Tr. 72-73).

For her first hypothetical, the ALJ asked the VE to consider an individual of the same age and education as the claimant, and with the same work history excepting the job of dump truck driver, capable of performing light work except that the individual can never climb ladders, ropes or scaffolds; can occasionally climb ramps and stairs, balance, crouch, kneel, stoop, and crawl; can occasionally reach overhead bilaterally; can frequently finger, handle, and feel bilaterally; can occasionally push and/or pull or operate foot controls with the right lower extremity; can

8

frequently push and/or pull or operate foot controls with the left lower extremity; cannot work around vibrations, unprotected heights or heavy machinery; and can occasionally perform any occupational driving. (Tr. 73). The VE opined that this individual could perform Boetticher's past work as a machine operator, both as it is described in the DOT and as Boetticher actually performed it. (Tr. 73-74). The individual could also perform other light, unskilled, SVP 2 jobs, such as cashier, DOT 211.462-010, with approximately 570,000 jobs nationally; retail marker, DOT 209.587-034, with approximately 226,000 jobs nationally, and inspector/packer, DOT 559.687-074, with 7,000 jobs nationally. (Tr. 74). The VE further testified that employers expect someone to be on task at least 85% of the time, and will typically allow one absence per month. (*Id.*). Anything beyond those levels would be work preclusive. (*Id.*).

On questioning by Boetticher's attorney, VE Everts testified that if the individual in the ALJ's first hypothetical were limited to occasional handling and fingering, that individual would be unable to perform Boetticher's past work, none of the three jobs cited would remain available, and there would only be one job available within that limitation. (Tr. 75). The VE also testified that if the individual in the ALJ's first hypothetical required the ability to switch position and move away from the work station, the individual would be unable to perform Boetticher's past work, and there would be no other jobs available. (*Id.*).

**IV.    The ALJ's Decision**

In her decision dated May 24, 2024, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since December 19, 2022, the application date (20 CFR 404.1571 *et seq*.).

2. The claimant has the following severe impairments: cervical, thoracic, and lumbar degenerative disc disease; fibromyalgia; bilateral hallux valgus deformities; bilateral carpal tunnel syndrome; right knee osteoarthritis and meniscus tear and small cysts, status post May 2023 medial meniscectomy; and sacroiliitis (20 CFR 416.920(C)).

9

    3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

    4.      After careful consideration of the entire record, the undersigned finds that the claimant had the residual functional capacity to perform light work as defined in 20 CFR 416.967 (b) except: The claimant can never climb ladders, ropes, or scaffolds and can occasionally climb ramps and stairs, balance, crouch, kneel, stoop, and crawl. With the bilateral uppoer extremities, he can occasionally reach overhead and frequently handle, finger, and feel. With the right lower extremity, he can occasionally push and/or pull or operate foot controls. With the left lower extremity, he can frequently push and/or pull or operate foot controls. He cannot work around vibrations, unprotected heights, or heavy machinery. He can occasionally perform any occupational driving.

    5.      The claimant is capable of performing past relevant work as a machine operator, Dictionary of Occupational Titles (DOT) #754.685-014, SVP 2, light as listed and performed. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 416.965).

    6.      The claimant has not been under a disability, as defined in the Social Security Act, since December 19, 2022, the date the application was filed (20 CFR 416.920(f)).

(Tr. 14-29).

## V.    Law and Analysis

### A.    Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1. whether the claimant is engaged in substantial gainful activity;
2. if not, whether the claimant has a severe impairment or combination of impairments;
3. if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

> 4. if not, whether the claimant can perform their past relevant work in light of his RFC; and
>
> 5. if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v)[1]; *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B. Standard of Review

This Court reviews the Commissioner's final decision to determine whether it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*, quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d

---

[1] The regulations governing DIB claims are found in 20 C.F.R. § 404, *et seq.* and the regulations governing SSI claims are found in 20 C.F.R. § 416, *et seq.* Generally, these regulations are duplicates and establish the same analytical framework. For ease of analysis, I will cite only to the relevant regulations in 20 C.F.R. § 404, *et seq.* unless there is a relevant difference in the regulations.

at 241; *see also Biestek*, 880 F.3d at 783. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012).

## VI. Discussion

Boetticher raises a single issue for this Court's review, arguing that the ALJ improperly relied upon her own lay opinion in assessing the RFC. (ECF Doc. 7, p. 1). Specifically, Boetticher argues that the ALJ found the only opinions of record partially persuasive but vague, and further that these opinions failed to address his bilateral carpal tunnel syndrome and cervical spine issues. (*Id.* at p. 10). The only meaningful opinions in the record were rendered by the state agency reviewing physicians, neither of whom addressed Boetticher's carpal tunnel diagnosis.

(*Id.* at p. 11). The ALJ offered no explanation for her assessment of the frequency for handling, fingering, and overhead reaching, thereby, in Boetticher's view, frustrating meaningful review. (*Id.*). Boetticher contends that the lack of opinion evidence on these topics necessitated that the ALJ further develop the record for an opinion regarding these impairments and the resulting functional limitations. (*Id.* at p. 12).

The Commissioner responds that Boetticher's argument should be rejected because the ALJ explained the basis of her RFC finding, and the ALJ's RFC need not be based on any medical opinion. (ECF Doc. 9, p. 5). The Commissioner notes that Boetticher relied on cases descended from *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908 (N.D. Ohio 2008), and *Deskin* itself, as support for his claim of the requirement of a medical opinion to base the RFC upon, and argues that subsequent case law has shown *Deskin* is not binding law. (ECF Doc. 9, pp. 5-6). As Boetticher has pointed to no diagnostic evidence that the ALJ might have improperly interpreted when assessing the RFC, the Commissioner argues the ALJ did not commit error. (*Id.* at p. 7).

The RFC assessment requires an ALJ to walk a fine line. An ALJ must temper her duty to evaluate the medical and other evidence with the temptation to "play doctor" by substituting her own medical judgment for that of medical professionals. *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990); *accord Meece v. Barnhart*, 192 F. App'x 456, 465 (6th Cir. 2006); *Winning v. Comm'r of Soc. Sec.*, 661 F. Supp. 2d 807, 823-24 (N.D. Ohio 2009) ("[A]n ALJ 'does not have the expertise to make medical judgments.'"). An ALJ might cross this fine line when she: (1) rejects a medical opinion without relying on other evidence or authority in the record; (2) interprets *raw medical data* (*e.g.*, uninterpreted x-rays and lab results); or (3) applies a sit-and-squirm test to assess a claimant's limitations based on observations at the hearing. *See*,

13

*e.g.*, *Harris v. Comm'r of Soc. Sec.*, No. 1:14-cv-1212, 2015 WL 770340, at *19 (N.D. Ohio, Feb. 23, 2015) (collecting cases indicating that an ALJ needs a medical opinion to interpret "raw medical data"); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) ("[A]n ALJ must not substitute his own judgment for a physician's opinion without relying on other evidence or authority in the record."); *Weaver v. Sec'y of Health and Hum. Servs.*, 722 F.2d 310, 312 (6th Cir. 1983) (requiring an ALJ to cite evidence beyond personal observations).

Nevertheless, the Sixth Circuit has "rejected the argument that an [RFC] determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ." *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018). The RFC determination "is an 'administrative finding,' and the final responsibility for determining an individual's RFC is reserved to the Commissioner." *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442 (6th Cir. 2017). And an ALJ does not err simply because her RFC finding is based on the objective medical evidence instead of a physician's opinion. *See Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) ("[T]o require the ALJ to base [his] RFC finding on a physician's opinion, would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." (quotation marks omitted)).

Here, Boetticher relies on several cases following a similar line of reasoning as *Deskin* to support the contention that the ALJ must generally obtain a medical expert opinion when formulating the RFC unless "the medical evidence shows relatively little physical impairment such that the ALJ can permissibly render commonsense judgment about functional capacity." (ECF Doc. 7, p. 10 citing *Guido v. Comm'r of Soc. Sec..,* No. 13-cv-13520, 2014 WL 4771929,

14

at *12 (E.D. Mich. Sept 24, 2014); *Wyatt v. Comm'r of Soc. Sec.,* No. 12-11406, 2013 WL 4483074, at *16 (E.D. Mich. Aug. 19, 2013); *Allen v. Comm'r. of Soc. Sec.,* No. 12-15097, 2013 WL 5676254, at *15 (E.D. Mich. Sept. 13, 2013), *report and recommendation adopted,* No. 12-15097, 2013 WL 5676251 (E.D. Mich. Oct 18, 2013); *Ali v. Comm'r of Soc. Sec.,* No. 15-14483, 2017 WL 726665, at *11 (E.D. Mich. Jan. 20, 2017), *report and recommendation adopted,* No. 15-14483, 2017 WL 712899 (E.D. Mich. Feb. 23, 2017)).

But, as the Court noted in *Carr v. Comm'r of Soc. Sec.* No. 23-CV-00187, 2024 WL 1556398, at *11 (N.D. Ohio Jan. 8, 2024), "*Deskin* is not binding authority and several courts in the District have criticized or declined to follow the *Deskin* standard." *See, e.g., Winans v. Comm'r of Soc. Sec.*, No. 5:22-cv-01793, 2023 WL 7622634, *4 (N.D. Ohio November 15, 2023); *Fox v. Comm'r of Soc. Sec.*, No. 5:23-CV-580, 2023 WL 7018362, at *8-9 (N.D. Ohio Oct. 10, 2023) (noting *Deskin* is not controlling and finding "the ALJ had sufficient evidence to make his determination and the record doesn't establish that a consultative examination was necessary"), *report and recommendation adopted*, No. 5:23 CV 580, 2023 WL 7222824 (N.D. Ohio Nov. 2, 2023); *Davidson v. Comm'r of Soc. Sec.*, No. 3:22CV938, 2023 WL 5948122, *4 (N.D. Ohio Sept. 13, 2023) ("This Court has itself recently determined reliance on 'stale' non-examining state agency opinions does not require remand."); *Van Pelt v. Comm'r of Soc. Sec.*, No. 1:19 CV 2844, 2020 WL 7769729, at *10-11 (N.D. Ohio Dec. 30, 2020) (discussing Sixth Circuit decisions contrary to *Deskin* and finding reliance on "outdated" non-examining state agency opinions did not require remand where the ALJ considered subsequent medical evidence). Further, the determinative inquiry in assessing whether the ALJ properly evaluated the RFC is not whether the ALJ gathered a requisite medical opinion, but, rather, whether the RFC is supported by substantial evidence. *See Mokbel-Aljahmi* 732 F. App'x 395. In *Mokbel-*

15

*Aljahmi*, the plaintiff argued that where an ALJ gave no weight to physicians' opinions, the ALJ was required to get the opinion of another physician before determining the RFC. The 6th Circuit disagreed, writing:

> We have previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ. *See Shepard v. Comm'r of Soc. Sec.*, 705 Fed.Appx. 435, 442–43 (6th Cir. 2017) (rejecting the argument that "the ALJ's [residual functional capacity] lacks substantial evidence because no physician opined that [the claimant] was capable of light work"); *Rudd v. Comm'r of Soc. Sec.*, 531 Fed.Appx. 719, 728 (6th Cir. 2013) (rejecting the same argument because "the ALJ is charged with the responsibility of determining the [residual *402 functional capacity] based on her evaluation of the medical and non-medical evidence"). We similarly find no error here. The ALJ undertook a laborious evaluation of the medical record when determining the residual functional capacity, and substantial evidence supports the ALJ's conclusions.

*Id.* at 401.

Here, in finding the opinions of the state agency reviewing physicians somewhat persuasive, the ALJ noted that the restriction to "limited overhead reaching" was vague as to whether that would indicate overhead reaching would be frequent or occasional. (Tr. 25). The ALJ then articulated her reasoning for the RFC determination for overhead reaching, as well as handling and fingering, writing that Boetticher had:

> [A] five out of five grip and no tenderness in the cervical, thoracic or lumbar spine and normal gait with no joint deformities and he had atrophy and flattening of the thenar eminence in his hand but full range of mtion in his wrists and fingers . . . [t]he claimant is able to shovel, build objects, use a hammer, etc. that shows the ongoing ability to use his upper extremities. However, given his carpal tunnel diagnosis and the claimant's testimony that he does drop objects, he has bene (sic) limited to the frequent use of the upper extremities for handling and fingering and occasional reaching overhead given his cervical impairments.

(Tr. 26, *see also* Tr. 57-62, 348, 523-26, 805). This explanation is based on a thorough review of the medical records, and provides substantial evidence creating a logical and accurate bridge, allowing for meaningful subsequent review of the RFC. Further, Boetticher does not point to any specific medical evidence that might have been improperly interpreted when assessing his RFC.

16

Boetticher seems to suggest that because the ALJ found the state agency physician opinions only somewhat persuasive, the ALJ is thus required to order a separate medical opinion. An ALJ is under no such mandate. *Watson v. Comm'r of Soc. Sec.*, 25-cv-287, 2025 WL 2458765, at *5 (N.D. Ohio, August 27, 2025). In determining the RFC, the ALJ evaluated the evidence appropriately and properly articulated her findings. Accordingly, the ALJ met her burden in this matter, and I recommend her decision be affirmed.

## VII. Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Boetticher's application for SSI be affirmed.

Dated: January 2, 2026

Reuben J. Sheperd
United States Magistrate Judge

---

## OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C

17

636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

***

Failure to file objection within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendations. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991) Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act." *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, 2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interests of justice. *See United States v. Wandashega,* 924 F.3d 868, 878-79 (6th Cir. 2019)